UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| John Solak, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>    - against -<br><br>Target Corporation,<br><br>       Defendant | **Case No. 3:22-cv-813 (TJM/ML)**<br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Target Corporation ("Defendant") manufactures, markets, labels, and sells 3% hydrogen peroxide solution, identified as a first aid antiseptic and promoted "for treatment of minor cuts and abrasions," under the up & up brand ("Product").



2. In the context of first aid, an antiseptic is a chemical with antimicrobial activity, applied to the skin to help prevent infection in minor cuts, scrapes, and burns.

3. Following its discovery in the 1920s, hydrogen peroxide was used to treat a range of unrelated conditions including typhoid, diphtheria, bowel infections, eczema, epilepsy, influenzal pneumoniae, bladder infections, wounds and even as an intravenous source of oxygen during cardiopulmonary resuscitation.

4. Alexander Fleming discovered that wounds treated with antiseptics like hydrogen peroxide had higher death rates and slower healing than wounds not treated at all.

5. A prominent doctor noted that a "dangerous medical myth[. . .] is the widespread belief by patients that copious amounts of hydrogen peroxide should be applied to treat cuts and scrapes."[1]

6. Dictionaries define "treat" as attempting to heal, improve or cure a condition.

7. While hydrogen peroxide may reduce the number of bacteria at a wound, no credible evidence supports a connection between the number of bacteria and reduction in healing time of a clean wound.

8. While the back panel Drug Facts contains the authorized statement that the Product can be "Use[d] [as] first aid to help prevent the risk of infection in minor cuts, scrapes and burns," this function is distinct from the "treatment of minor cuts and abrasions," which it is not authorized to claim.

---

[1] Michael Daignault, M.D., "Everyone puts hydrogen peroxide on their wounds. They really shouldn't." USA TODAY, Feb. 2, 2022; Roger on Tuesday, Medical Myth Buster: Hydrogen Peroxide and Wounds, Atlantic Feet, June 9, 2015; Aviva Patz, 9 First Aid Mistakes You're Probably Making, Prevention.com, July 2, 2015.



9. While hydrogen peroxide has antiseptic properties, the Mayo Clinic and numerous medical studies advise that it does not help treat minor cuts and abrasions.[2]

10. While the bactericidal effects of hydrogen peroxide can help clean a cut or abrasion and initially kill bacteria, its caustic properties negatively effect healthy cells involved in wound healing.

11. Most minor skin injuries, including cuts, burns, scrapes and abrasions, are self-healing.

12. In response to an injury, platelets release fibrin to form a clot and seal the wound.

---

[2] Mayo Clinic Staff, Cuts and scrapes: First aid, Nov. 17, 2021; Reid, C. J., M. Alcock, and D. Penn. "Hydrogen peroxide–a party trick from the past?." Anaesthesia and intensive care 39.6 (2011): 1004-1008; Cleveland Clinic, What Is Hydrogen Peroxide Good For? Dec. 1, 2021

13. White blood cells called macrophages rush to the area to destroy bacteria that gets past the clot and oversee the repair process.

14. Macrophages also secrete growth factors which help repair the wound.

15. Blood vessels then dilate to allow fresh nutrients and oxygen to flow to the area and facilitate healing.

16. The representation the Product should be used "for treatment of minor cuts and abrasions" tells purchasers it will assist in the healing process and shorten healing time, when this statement is false, misleading, and not authorized by any applicable body.

17. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

18. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

19. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

20. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

21. Had Plaintiff known the truth, he would not have bought the Product or would have paid less for it.

22. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $1.29 for 32 FL OZ, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

23. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

24. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

25. Plaintiff John Solak is a citizen of New York.

26. Defendant Target Corporation is a Minnesota corporation with a principal place of business in Minneapolis, Hennepin County, Minnesota.

27. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

28. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in hundreds of locations across the States covered by Plaintiff's proposed classes.

29. The Product is available to consumers from Defendant's retail stores and its website.

30. Venue is in this District because a substantial part of the events or omissions giving rise to these claims occurred in Binghamton, New York, Broome County, including Plaintiff's purchase, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

31. Plaintiff John Solak is a citizen of Binghamton, New York, Broome County.

32. Defendant Target Corporation is a Minnesota corporation with a principal place of business in Minneapolis, Minnesota, Hennepin County.

33. Founded as the Dayton Dry Goods Company by George D. Dayton in 1902, Target

has almost 2,000 stores in the United States.

34. Dayton's principles shaped the future of Target, as he was committed to "the higher ground of stewardship," which meant dependable merchandise and fair business practices.

35. Target was one of many "upscale" discount stores which emerged in the 1960s.

36. One of Target's defining features was experimenting with new retail concepts.

37. For example, Target developed B. Dalton, the country's largest bookstore during the 1970s and 1980s.

38. Target has been known for its values and unique approach to business and community, through its ethics, transparency to investors and customers, and philanthropy.

39. While Target stores sell leading national brands, they also sell a large number of products under one of their private label brands, up & up.

40. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

41. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

42. Products under the up & up brand have an industry-wide reputation for quality and value.

43. In releasing products under the up & up brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

44. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

45. That up & up branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

46. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

47. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

48. Private label products under the up & up brand benefit by their association with consumers' appreciation for the Target brand as a whole.

49. The development of private label items is a growth area for Target, as they select only top suppliers to develop and produce up & up products.

50. The Product is available to consumers in this District from Defendant's retail stores and website.

51. Plaintiff purchased the Product at Target locations including 3112 Vestal Pkwy E, Vestal, NY 13850 at least once within between August 1, 2019 and August 1, 2022, among other times.

52. Plaintiff believed and expected the Product could treat minor cuts and abrasions because that is what the representations and omissions said and implied, on the front label and the absence of any references or statements elsewhere.

53. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

54. Plaintiff bought the Product at or exceeding the above-referenced price.

55. Plaintiff would not have purchased the Product if he knew the representations and omissions with respect to its use for treatment of minor cuts and abrasions were false and misleading or would have paid less for it.

56. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

57. The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

## Class Allegations

58. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Maine, Montana, Alaska, Arkansas, Iowa, Kansas, Alabama, Utah, Indiana, and Nebraska who purchased the Product during the statutes of limitations for each cause of action alleged.

59. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

60. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

61. Plaintiff is an adequate representative because her interests do not conflict with other members.

62. No individual inquiry is necessary since the focus is only on Defendant's practices

and the class is definable and ascertainable.

63. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

64. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

### General Business Law§§ 349 and 350

65. Plaintiff incorporates by reference all preceding paragraphs.

66. Plaintiff believed the Product could treat minor cuts and abrasions.

67. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

68. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

69. Plaintiff relied on the representations and omissions to believe the Product could treat minor cuts and abrasions.

70. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts

### (On Behalf of the Consumer Fraud Multi-State Class)

71. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

72. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent

and/or the consumer protection statute invoked by Plaintiff.

73. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

74. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

75. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

76. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it could treat minor cuts and abrasions.

77. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, distributed product descriptions, and targeted digital advertising.

78. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

79. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it could treat minor cuts and abrasions.

80. Defendant's representations affirmed and promised that the Product could treat minor cuts and abrasions.

81. Defendant described the Product so Plaintiff believed it could treat minor cuts and abrasions, which became part of the basis of the bargain that it would conform to its affirmations and promises.

82. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

83. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company selling the acclaimed up & up brand, known for the highest quality products.

84. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

85. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

86. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

87. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

88. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

89. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it could treat minor cuts and abrasions.

90. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it could

11

treat minor cuts and abrasions, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

91. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

92. Defendant had a duty to truthfully represent the Product, which it breached.

93. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, custodian of the Target name and up & up brand, recognized for the highest quality products which exceed their national brand counterparts.

94. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

95. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

96. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

97. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, her purchase of the Product.

98. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

99. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it could treat minor cuts and abrasions.

100. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

101. Defendant knew of the issues described here yet did not address them.

102. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

## Unjust Enrichment

103. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages, statutory and/or punitive damages, restitution, disgorgement, and interest, pursuant to any statutory and common claims;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   August 1, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021

(516) 268-7080
spencer@spencersheehan.com

James Chung
Law Office James Chung